**In re OKLAHOMA P.A.C. FIRST LIMITED PARTNERSHIP, an Arizona limited partnership, Debtor.**

**OKLAHOMA P.A.C. FIRST LIMITED PARTNERSHIP, an Arizona limited partnership, Plaintiff,**

v.

**METROPOLITAN MORTGAGE & SECURITIES CO., INC., et al., Defendants.**

**Bankruptcy No. B–89–08110–PHX–SSC. Adv. No. 91–124.**

United States Bankruptcy Court, D. Arizona.

Feb. 26, 1993.

Carolyn J. Johnsen, Hebert, Schenk, Johnsen & Dake, P.C., Phoenix, AZ, for debtor/plaintiff.

Rebecca R. Driggs, Murphy & Posner, Phoenix, AZ, for First Federal Savings and Loan Ass'n of Central Indiana.

Rex C. Anderson, Shapiro & Sutton, Phoenix, AZ, for Hinton Mortg. and Investment Co., Victoria Mortg. Co., Independence One Mortg. Corp., and J.I. Kislak Mortg. Corp.

Sara D. Branscum, Gallagher & Kennedy, Phoenix, AZ, for Home Federal Bank and American Charter Federal Sav. and Loan Ass'n.

## AMENDED MEMORANDUM DECISION AND ORDER

SARAH SHARER CURLEY, Bankruptcy Judge.

This matter comes before the Court upon the Motion for Summary Judgment and Statement of Facts, filed on February 2, 1992, by the Debtor, Oklahoma P.A.C. First Limited Partnership, an Arizona limited partnership. The Motion requests judgment be entered in Debtor's favor and against the numerous defendants in this adversary proceeding. The various defendants filed their Responses, Statements of Facts, and Cross–Motions for Summary Judgment. A complete list of the pleadings filed by the various parties is as follows:

1. Motion for Summary Judgment and Supporting Memorandum of Points and Authorities, filed on February 7, 1992, by Debtor/Plaintiff;

2. Statement of Facts, filed on February 7, 1992, by Debtor/Plaintiff;

3. Statement of Facts, filed on March 9, 1992, by First Federal Savings and Loan Association of Central Indiana;

4. First Federal Savings and Loan Association of Central Indiana's Response to Debtor/Plaintiff's Motion for Summary Judgment, filed on March 9, 1992;

5. Hinton, Victoria, Kislak and Independence One Cross–Motion for Summary Judgment and Response to Debtor's Motion for Summary Judgment, filed on March 13, 1992;

6. Statement of Facts of Hinton, Independence One, Victoria, and Kislak, filed on March 13, 1992;

7. Response of American Charter Federal Savings & Loan Association and Home Federal Bank to Oklahoma P.A.C. First Limited Partnership's Motion for Summary Judgment and Supporting Memorandum of Points and Authorities, and Cross–Motion for Partial Summary Judgment, filed on March 16, 1992;

8. Statement of Facts in Opposition to Cross–Motions for Summary Judgment; Supplemental Statement of Facts in Support of Motion for Summary, filed on March 31, 1992, by Debtor/Plaintiff;

9. Reply to Defendants' Responses to Motion for Summary Judgment; Response to Cross–Motions for Summary Judgment, filed on March 31, 1992, by Debtor/Plaintiff;

10. Reply to Debtor's Response to the Hinton et al. Cross Motion for Summary Judgment, filed on April 16, 1992, by Hinton, Victoria, and Independence One, and J.I. Kislak Mortgage Corporation;

11. Reply of Home Federal Bank and American Charter Federal Savings & Loan Association to Plaintiff's Response to Cross–Motion for Summary Judgment, filed on April 20, 1992;

12. Supplemental Memorandum of Hinton et al., filed on June 5, 1992, by Hinton, Victoria, J.I. Kislak, and Independence One;

13. Stipulated Facts Re: Properties of Hinton et al., filed June 5, 1992, by Debtor and Defendants;

14. Second Supplemental Memorandum of Hinton et al., filed on June 15, 1992, by Hinton, Victoria, J.I. Kislak, and Independence One; and

15. Plaintiff's Response to Supplemental Memorandum of Hinton, et al.; Notice of Supplemental Authority, filed on July 30, 1992, by Debtor/Plaintiff.

On June 3, 1992, a hearing was conducted on the Motion and Cross–Motions. Although one Counsel requested that Exhibit A be marked and admitted in evidence as to the parties that he was representing, he agreed with Debtor's Counsel that a Stipulation should be entered into essentially updating the facts pertaining to the properties listed on Exhibit A admitted in evidence. The Stipulated Facts, entered into between Counsel for the Debtor and Counsel on behalf of Hinton Mortgage and Investment Company, Victoria Mortgage Company, Independence One Mortgage Corporation, and J.I. Kislak Mortgage Corporation, ("Hinton, et al.") was filed with this Court on June 5, 1992.

On June 5, 1992 and June 15, 1992, Hinton, et al., filed Supplemental and Second Supplemental Memoranda of Law ("Supplemental Memoranda"). On July 30, 1992, the Debtor filed its own Supplemental Memorandum of Law.

This shall constitute this Court's findings of facts and conclusions of law pursuant to Rule 7052, *Rules of Bankruptcy Procedure* ("RBP"). This Court has jurisdiction over this matter, and this is a "core" proceeding. 28 U.S.C. §§ 1334 and 157.

*Discussion*

The Debtor is a limited partnership formed just prior to filing a bankruptcy petition. On August 31, 1989, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtor retained possession of certain parcels of real property and operated as a debtor-in-possession.

At the time of the filing of the Chapter 11, the Debtor owned 311 residential properties ("Houses"), in which the Defendants claimed a security interest by virtue of certain deed of trust liens.[1] The Debtor acquired these Houses subject to the liens or encumbrances of the Defendants, resulting from the execution of the promissory notes or deeds of trust by third parties and the Defendants and pertaining to the Houses. The Debtor has not assumed the indebtedness of the Defendants as to any of these Houses.

The Houses are each situated on less than 2.5 acres, and with the exception of Lots 7, 9, 10, 24, 25, and 26, North Mesa Village, the Houses are either utilized as single, one-family or single, two-family dwellings.

From August 31, 1989 (the commencement of the case) through January 6, 1992, certain of the Houses produced income for the Debtor in the nature of monthly lease and/or contract payments. These funds have been segregated and held by the Debtor pending resolution of this adversary proceeding, with the exception of the payments made by the Debtor as approved by the Court. The segregated income is referred to as the "Bankruptcy Funds."

The Debtor's bankruptcy case has been dismissed, and the Court has retained jurisdiction over this adversary proceeding only to resolve the remaining issue as to which party or parties to this adversary proceeding

---

1. The Debtor owned other real property as well. However, that real property is not relevant to the decision of the Court on this matter.

shall receive all, or a portion, of the Bankruptcy Funds.

The Defendants American Federal Savings & Loan Association of Colorado, First Commercial Mortgage, Glendale Federal Bank, Commonwealth Mortgage Company, Central Savings Bank, D & N Savings Bank, First Nationwide Bank and Troy & Nichols, Inc., have stipulated that they have no interest in Adversary No. 91–124 or any claim to the Bankruptcy Funds.

None of the remaining Defendants have instituted a lawsuit in the state court predicated upon a deficiency arising from the sale of Houses. However, the remaining Defendants have recorded their deeds of trust in the appropriate County Recorder's Office creating a lien on each parcel of real property owned by the Debtor. Each deed of trust was recorded prior to the Debtor filing its bankruptcy petition, and none of the liens created hereby have been avoided by the Debtor. Each deed of trust contains an assignment of rents clause. The remaining Defendants have notified the Court, the Debtor, and other interested parties of their security interest in the net proceeds or rental income derived from the Houses.

### Facts specific to Victoria Mortgage Company ("VMC").

VMC claimed a first lien on 15 houses ("VMC Houses")[2] by virtue of individual promissory notes and deeds of trust executed by James S. Sexton and Pamela M. Sexton.

Pursuant to the June 5, 1992 Stipulated Facts, VMC has foreclosed on 13 of the 15 Houses. At the time the trustee's sale was conducted on each of the 13 Houses, VMC credit bid the aggregate amount of the indebtedness due and owing on the promissory notes and the deeds of trusts, including costs and attorneys' fees. VMC was the successful bidder at each of the trustee's sales. The automatic stay was vacated as to VMC on all of the Houses, except for Lot 201 Fuller Ranch, as of November 26, 1990. The loans have been reinstated as to Lot 201, Fuller Ranch and Lot 191, Fuller Ranch. VMC

states that the Debtor routinely pays the monthly installment on Lot 201 Fuller Ranch one month late.

### Facts Specific to Independence One Mortgage Company ("Independence").

Independence claimed a first lien on one house identified as Lot 43, Stapley Gardens ("SG"), by virtue of a promissory note and deed of trust executed by T.L. Taylor.

The automatic stay pursuant to 11 U.S.C. § 362 was vacated as of July, 1990 with respect to Lot 43, SG.

In the June 5, 1992 Stipulated Facts, the Debtor and Independence agreed that the House was sold at a trustee's sale conducted on October 25, 1991. Independence was the successful bidder.

Independence credit bid the total amount of the indebtedness due and owing on the promissory note and deed of trust, including costs and attorneys' fees, at the trustee's sale.

### Facts specific to Hinton Mortgage and Investment Company ("Hinton").

Hinton claimed a first lien on 62 Houses ("Hinton Houses") identified on the June 5, 1992 Stipulated Facts, by virtue of individual promissory notes and deeds of trust executed by various parties identified in the Debtor's Statement of Facts.

The automatic stay was vacated as of the dates identified in the Debtor's Statement of Facts, with respect to 61 of the Hinton Houses, except that the automatic stay was vacated as to 81 Sunset Meadow and 1507 Desert Sands on September 20, 1991.

Hinton has foreclosed its deeds of trust on 53 of the Hinton Houses.[3]

Hinton credit bid the aggregate amount of the indebtedness due and owing on the promissory notes and deeds of trust, including costs and attorney's fees, at each of the trustee's sales conducted for each of the Hinton Houses that were foreclosed. Hinton

---

**2.** See Stipulated Facts filed on June 5, 1992.

**3.** See June 5, 1992 Stipulated Facts.

was the successful purchaser at each of the trustee's sales.

With respect to seven of the Hinton Houses identified on the June 5, 1992 Stipulated Facts as "current," the Debtor has paid Hinton all past due amounts owing on the promissory notes and deeds of trust, and maintains these loans on a current basis.

With respect to one House, 116 Fuller Ranch, the Debtor stated that it had abandoned or "returned" this House to Hinton. In the June 5, 1992 Stipulated Facts, Hinton states that the loan as to this House is current.

Finally, one House was sold by the Debtor with Court approval.[4]

### Facts Specific as to J.I. Kislak Properties ("Kislak")

The Debtor and Kislak have entered into a separate statement of stipulated facts as to eleven properties in which Kislak had an interest.

Kislak is apparently the successor in interest to Banner Banc Savings Association.

A trustee's sale was held on only two of the Kislak properties; that is, Lot 17, Centurion Meadow; and Lot 5, El Dorado Estates. Kislak credit bid the aggregate amount of the indebtedness due and owing under the promissory notes and the deeds of trust.

The other properties are listed as "current" or "payment due as of May, 1992" concerning the remaining extant Kislak loans.[5]

### Facts specific to American Charter Federal Savings & Loan Association ("AC").

AC claimed a first lien on three Houses ("AC Houses") by virtue of individual promissory notes and deeds of trust executed by certain parties.[6]

The automatic stay was vacated on the AC Houses as of November 26, 1990.

AC has foreclosed its deeds of trust on the AC Houses, with AC credit bidding a partial amount of the indebtedness due and owing on the promissory notes and deeds of trust at each of the trustee's sales conducted for certain AC Houses, and becoming the successful purchaser.

### Facts specific to Home Federal Bank, F.S.B., Formerly Home Federal Savings & Loan Association ("Home Federal").

Home Federal claimed a first lien on 31 Houses by virtue of individual promissory notes and deeds of trust executed by certain parties. Of these Houses, 21 have been subject to foreclosure. Home Federal credit bid a substantial portion of the indebtedness due and owing on the promissory notes and deeds of trust. Home Federal was the successful purchaser at these trustee's sales.

As to the remaining Houses, the Debtor is either current or has brought the loans current except for five Houses; the Debtor apparently abandoned the remaining five Houses.

### Facts Specific to First Federal Savings & Loan Association of Central Indiana ("FSL")

FSL claimed a first lien on 36 Houses by virtue of certain promissory notes and deeds of trust executed by Cardon Corporation. The automatic stay was vacated as to 12 of the FSL Houses as of the dates set forth on the Debtor's Statement of Facts. The Debtor apparently brought current or reinstated the loans as to 15 of these Houses. The Debtor intends to abandon the other 21 Houses.

As a part of various motions to vacate the automatic stay, the Debtor entered into various stipulations with the Defendants concerning the market value of the Houses. To the extent the Debtor was unable to stipulate to a market value, the Court determined same at a final hearing on the motion to vacate the stay. The credit bids of the Defendants at the trustee's sales are either equal to the market value of the real property *or exceed* the aforesaid value.

---

**4.** See June 5, 1992 Stipulated Facts as to 178 Suntree.

**5.** See June 5, 1992 Stipulated Facts.

**6.** See Debtor's Statement of Facts.

*I. Houses Which Have Been Foreclosed— To What Extent Is The Secured Creditor Entitled To The Bankruptcy Funds*

A motion for summary judgment should be granted if movant has shown that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. F.R.Civ.P. 56(c), RBP 7056. Ruling on a motion for summary judgment necessarily implicates that substantive evidentiary standard of proof which would apply at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986). The facts, in this case, are not in dispute. The Debtor and the various Defendants do have a dispute as to how to apply the law to the facts. Therefore, summary judgment is proper in this case, if one or more parties are entitled to judgment as a matter of law.

In analyzing the dispute between the Debtor and the remaining Defendants, the Court must review Arizona law. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

Each of the Defendants on the motions for summary judgment was owed, on each parcel of real property, a specific indebtedness and had a valid lien prior to the trustee's sale thereon. However, Hinton, Independence One, Victoria, and Kislak ("Hinton et al.") proceeded differently at the trustee's sales. A few of the Defendants only credit bid a portion, or a substantial portion, of the indebtedness due and owing to them. However, Hinton et al. ascertained the total amount due and owing on the promissory notes and the deeds of trust at the time of the trustee's sales and then credit bid the full amount then due and owing.

a. *Whether The Liens Of Hinton et al. Were Extinguished; And As A Result, Said Defendants Are Not Entitled To Any Of The Bankruptcy Funds.*

The Debtor cogently argues that if Hinton et al. credit bid the full amount of the indebtedness then due and owing on the promissory notes and the deeds of trust at the time of the trustee's sales, said Defendants have been paid in full and the liens securing said indebtedness would be of no force and effect. Hinton et al. has attempted to create a factual or legal issue as to whether their indebtedness was paid in full as to certain parcels at the time of the trustee's sales thereon. However, in the discovery propounded by the Debtor in this adversary, Hinton et al. stated the total amount that was due and owing to them, as to each parcel, at the time of the trustee's sales thereon. The credit bid of Hinton et al., at each trustee's sale, equaled the aggregate amount then due and owing as to each parcel. From that information, this Court concludes that Hinton et al. has been paid in full at the trustee's sales, which is dispositive of the factual issue before this Court.

This Court has reviewed the decision of *Mortgage Investment of El Paso Tex. v. Taylor*, 49 Ariz. 558, 68 P.2d 340 (1937). The plaintiff, in *Taylor*, held a mortgage on an apartment house as security for an indebtedness due and owing to it. A lease of the real property had also been assigned to the plaintiff. The plaintiff subsequently foreclosed on the mortgage and had purchased the property at the foreclosure sale for the full amount of the judgment obtained in the mortgage foreclosure action. Certain rental proceeds from the real property had not yet been recovered from the lessee, and the plaintiff argued that it should receive said rents. The plaintiff stated that the mortgage granted a security interest in rental proceeds of the property, including any rents that had not yet been collected. The Supreme Court of Arizona denied the relief requested by the plaintiff as to the recovery of the rental proceeds, and stated:

[P]ayment of the mortgage would release the mortgaged property and, since the assignment of the lease was for additional security to the mortgage debt, the satisfaction of the debt would also release the additional security. The record conclusively shows that plaintiff had foreclosed its mortgage in the United States District Court for Arizona; that at the foreclosure sale it had bought in the property, including the lease, for the full amount of the judgment, costs, and accruing costs; and that the sale had been reported to the court and confirmed and satisfaction of judgment entered.

*Id.,* 68 P.2d at 342. The only issue that remained was whether the mortgagor would exercise the right of redemption under Arizona law. If the mortgagor did redeem, the indebtedness to the plaintiff would nevertheless be paid in full out of the redemption money. *Id.,* 68 P.2d at 343. The Court concluded that the plaintiff had only commenced the action against the defendant as the "assignee or lienor," and not as the owner of the property, and that the plaintiff no longer had a lien concerning, nor any claim under, the lease. *Id.* Since the indebtedness had been paid or satisfied, the plaintiff no longer had an interest in the lease, and the plaintiff's rights under the mortgage had been terminated. *Id.*

The Supreme Court, in *Taylor,* cited with favor the Colorado decision of *Plains Loan, Realty & Inv. Co. v. Hood,* 76 Colo. 322, 230 P. 1008 (1924), which further emphasized that a bid at the foreclosure sale of the entire amount of the indebtedness constituted a payment in full of the mortgage indebtedness and the ability to apply any rents or profits from the real property to the mortgage indebtedness existed only so long as the debt existed. The fact that the redemption period had not yet expired still did not entitle the mortgagee in *Hood* to retain any of the rents or profits from the real property.[7]

Hinton et al. has cited this Court to no statutory or case law authority which modifies or vitiates the *Taylor* decision. Any arguments by Hinton et al. that it has an additional lien on the Bankruptcy Funds misses the point. The additional lien is operative only if an indebtedness is extant. Hinton et al. does not dispute that it holds legal, as well as equitable, title to all of the properties. At the trustee's sales, it apparently made a determination of the fair market value of the properties, yet it then determined to bid in the full amount of its indebtedness to acquire said properties, even if the credit bids exceeded the fair market value of the properties. To the extent that the amount which was credit bid on a parcel of real property exceeded the then fair market value of the property, and Hinton et al. sustained a loss on the property, said Defendants made a poor business decision. Under Arizona law, Hinton et al. was only required to credit bid the fair market value of the real property, which could be less than the total amount due the Defendants, if it wished to pursue a deficiency balance and the Defendants had the right to pursue such a deficiency.[8]

When Hinton et al. further argued that it could not "underbid" at the time of the trustee's sales for less than the aggregate amount of the indebtedness, and could not rely on the Bankruptcy Funds which might be distributed to the Defendants, Hinton et al. again missed the point. No one asked it to underbid. It only needed to bid the fair market value of the properties, which it concededly did not do.[9]

---

7. As to other cases under Arizona law, which generally state that if an obligation is terminated, "fails", or is no longer in existence, the security therefor must fail, see *Maine v. Clack,* 43 Ariz. 492, 33 P.2d 283 (1934); *Weatherford v. Adams,* 31 Ariz. 187, 251 P. 453 (1926). *See also Czapar v. Ginter,* 76 Ariz. 84, 259 P.2d 253 (1953).

8. *See* Ariz.Rev.Stat.Ann. §§ 33–811, –814 (West 1974 & Supp.1992). In fact, almost all of the parcels of real property involved in this litigation are all concededly within the descriptive parameters of Ariz.Rev.Stat.Ann. §§ 33–814(E) (West 1974 & Supp.1992) of Arizona's anti-deficiency judgment statutes; that is, parcels of real property of less than 2.5 acres with a single one-family or single two-family dwelling thereon. As such, the Debtor, or third party, is protected from "any artificial deficiencies resulting from forced sales." See *Baker v. Gardner,* 160 Ariz. 98, 103–04, 770 P.2d 766, 769 (1988) (citing Arizona legislative history concerning the purpose for the enactment of the anti-deficiency judgment statutes.)

9. At oral argument, Counsel for Hinton et al. stated that said Defendants may have bid as much as 30 to 33% above the fair market value of the property. For instance, in its response to Debtor's Motion for Summary Judgment and Cross Motion for Summary Judgment, filed March 13, 1992, Hinton et al. stated that as to one parcel of real property (1502 Desert Sands), the unpaid indebtedness was approximately $44,200 at the commencement of the bankruptcy proceedings. During contested litigation over the property, the parties stipulated that the value of the real property was $53,000. However, when the trustee's sale occurred on this property in July of 1991, the credit bid amount was equal to the full amount of the indebtedness or the sum of $58,500, an increase of 33% over the amount due and owing at the time of the filing of the bankruptcy petition. (See Response at pp. 23–

The Defendants further rely on the decision of *Prudential Ins. Co. of Am. v. Fifty Assoc.*, 503 F.2d 925 (9th Cir.1974) (interpreting Arizona law) to support their position that they are still entitled to a portion of the Bankruptcy Funds. The mortgagor, mortgagee and ground lessee entered into certain documents creating an obligation due and owing to the mortgagee that was nonrecourse as to the mortgagor. The mortgage contained an assignment of rents clause, thereby providing that the rents received pursuant to the lease of the real property would serve as additional security for the repayment of the indebtedness due and owing to the mortgagee.

The ground lessee subsequently filed a petition under Chapter X of the Bankruptcy Act. During the course of the bankruptcy proceedings, a creditor of the lessee continued to pay the ground rent to protect its separate interest in the leasehold. The mortgagee also received an administrative expense claim in the proceedings for a portion of the unpaid ground rent; therefore, when the real property was eventually turned over to the mortgagee, the ground rent lease was current.

Once the real property was turned over to the mortgagee, the mortgagee commenced a foreclosure action, seeking, in the interim, a turnover of the rental proceeds from the real property. By stipulation, a receiver of the property was appointed. The parties further agreed that the mortgagee would receive a deed in lieu of foreclosure and that all remaining issues would be determined as if a marshal's sale of the real property had occurred on March 31, 1971, that the mortgagee had bid the sum of $3,277,610.24 at such a sale, and that *a deficiency balance of $1,600,-000 remained. Id.* at 928.

During the course of the foreclosure proceedings, the receiver continued to collect the rents on the property. A dispute arose as to which party was entitled to the rents. As a part of its analysis, the Court concluded that the mortgagee had obtained a properly perfected lien on the rental proceeds pursuant to Arizona law and that the

> [mortgagee's] judgment awarding it the rents is *not* a personal deficiency judgment contrary to the inserted clause insulating [the mortgagor/owner] from liability.

*Id.* at 929. The Ninth Circuit then determined that the mortgagee was entitled to a turnover of the rental proceeds accumulated by the receiver after the foreclosure action was commenced. The proceeds were determined to be additional security for the repayment of the deficiency balance. The deficiency balance was, therefore, in the nature of an *in rem* liability that would be satisfied from the proceeds of the real property. Although *Fifty Associates* is beneficial to certain Defendants in this case who did *not* bid in the full amount of their indebtedness at the trustee's sales, it does not assist Hinton et al. who bid the full amount of its indebtedness. Implicit in the *Fifty Associates* decision is the factual distinction from Hinton et al. that a deficiency balance existed after the foreclosure sale, which still remained unpaid.

In its Supplemental Memoranda, Hinton et al. argued that although a credit bid for the entire amount of the indebtedness was made at each trustee's sale, a residual debt still remained, since the loans were insured by Housing and Urban Development ("HUD"). Hinton et al. argued that HUD did not pay the accumulated interest at the contract rate and only paid a portion of the costs incurred. Irrespective of the amount to be paid by HUD to Hinton et al. pursuant to the underlying agreements, Hinton et al. may not negate what actually happened at the trustee's sales. Hinton et al. might have been concerned that a failure to bid the full amount due and owing at the trustee's sales would somehow vitiate the HUD insurance which would repay Hinton et al. However, Hinton et al. still bid the full amount of the debt at

---

24.) First, the Court notes that almost all of the Debtor's secured creditors requested an immediate sequestration of cash collateral. The creditors then engaged in a dispute as to the priority of their liens. Hence, it was unclear which party was entitled to receive the rental proceeds. As a result, the Debtor was not entirely to blame be-

cause there was no distribution of rental proceeds to certain secured creditors for a prolonged period of time. Second, it was solely the decision of the Hinton et al. Defendants to bid more than the fair market value of the parcels of real property at the trustee's sales.

each trustee's sale. A third party agreement between the Defendants and HUD should not affect the rights of the Debtor.

Hinton et al. further relies on *Rosenbaum v. Funcannon* [10] to support its position that it may credit bid the entire indebtedness at the trustee's sales and still recover from the additional security on the loans. However, *Rosenbaum* supports the decision of this Court. The creditor in *Rosenbaum* held a promissory note secured by a deed of trust on a parcel of real property owned by the debtor. Under a policy of fire insurance, the debtor was the named insured and the creditor was named as the mortgagee. The building on the debtor's property was insured against loss by fire in the amount of $25,000.

In August 1959, the building was destroyed by fire; and on September 28, 1959, the creditor purchased the property at a trustee's sale pursuant to *a bid in the full amount of the indebtedness then due and owing.* The debtor commenced an action on September 30, 1959, against the insurance company for the proceeds due under the fire insurance policy. The creditor intervened in the lawsuit, claiming that the creditor was entitled to be paid these proceeds.

Since the creditor had credit bid the full amount of the indebtedness, the Ninth Circuit affirmed the holding of the District Court; the debt was extinguished and the creditor was not entitled to recover the insurance proceeds. *Id.* at 683, 685. The District Court noted, however, in dicta [which the Court of Appeals adopted] that: ·

> the situation would have been different if the loss payable mortgagee ... had bid less for the property, as was her right. In such a case, a deficiency balance of the debt would have remained for which she would have had an entitlement out of the insurance policy. The extinguishment of the mortgage or deed of trust by the foreclosure would have affected her right to be paid the remainder of the debt under the policy.

*Id.* at 685. Thus, it is apparent, as noted above, that the *Rosenbaum* Court contemplated that a creditor, *which had made a bid for less than the full amount of the debt,* could maintain an action, to the extent of any balance still due and owing, to recover on additional collateral as to which the debtor also asserted an interest. All of the other decisions cited by Hinton et al. may also be distinguished on the basis that a deficiency balance or an outstanding indebtedness did exist when the secured creditor requested that certain funds from the real property be turned over to the creditor.

The Debtor, in its Supplemental Memorandum filed July 30, 1992, focuses on the recent decision of *Tanque Verde Anesthesiologists v. The Proffer Group,* 172 Ariz. 311, 836 P.2d 1021 (Ariz.Ct.App.1992). In *Tanque Verde,* the creditor released its first and second deed of trust on the real property, after the borrower sold the property and the creditor was paid, in part, from escrow. (Through prior assignment, the creditor had also acquired the beneficial interest of the first lien-holder.) Subsequently, the creditor sued for what it asserted was the unpaid deficiency balance on each loan. The Court focused on the agreement of the parties that the creditor had accepted the sum of $36,000 in full satisfaction of both deeds of trust. Moreover, the creditor was seeking a deficiency judgment, in contravention of the parties' agreement, to pursue additional property owned by the borrower. The creditor was not seeking to recover rents from the property which served as additional security. Therefore, the facts and the legal issues presented in *Tanque Verde* may be distinguished from those presented to this Court.

This Court concludes that Hinton et al. is not entitled to share in the Bankruptcy Funds to the extent that it proceeded to trustee's sales on the parcels of real property. The Court recognizes that as to certain parcels of real property, Hinton et al. has received payments to bring the loans current or the Debtor has abandoned the property to said Defendants, but the loans are being repaid by third parties. These parcels shall be discussed in a separate part of this opinion.

10. 308 F.2d 680 (9th Cir.1962).

b. *Whether A Secured Creditor Is Entitled To The Bankruptcy Funds If Only A Portion Of The Indebtedness Is Bid At The Time Of The Trustee's Sale.*

█ The Defendants, AC and Home Federal, only credit bid a portion of the indebtedness then due and owing to them as to each parcel of real property sold at a trustee's sale.

The Debtor argues that these Defendants are not entitled to the Bankruptcy Funds on a number of theories. The thrust of the Debtor's argument is to characterize the recovery of the Bankruptcy Funds as "an action on a deficiency judgment." The Debtor then reasons that such an "action" is barred on a number of theories.

This Court believes that the Debtor has mischaracterized the nature of this proceeding. AC and Home Federal are not seeking to recover on any kind of personal liability theory against the Debtor. The Bankruptcy Funds consist entirely of rental proceeds or profits received from the various parcels of real property. In the *Fifty Associates* decision, *supra,* applying Arizona law, the recovery of the rental proceeds was described as being an *in rem* action only. The loan in *Fifty Associates* was also described as being nonrecourse to the mortgagor/owner of the property. Nevertheless, as long as the mortgagee still had a loan balance due and owing to it, said party was entitled to the turnover of the rental proceeds recovered by the receiver during the course of the mortgage foreclosure action.

In this case, the Debtor was required, early in these proceedings, to sequester the rental proceeds received from the real property. The Debtor was not permitted to disburse these funds except upon order of the Bankruptcy Court. Therefore, the duties and responsibilities of the Debtor, as a fiduciary for its creditors, would be similar to those of a receiver of the real property under Arizona law. The Court believes, in such a situation, that the *Fifty Associates* analysis is clearly applicable to the facts herein.

A review of the bankruptcy cases also supports this Court's analysis. In the decision of *In re Madera Farms Partnership,* 66 B.R. 100 (Bankr. 9th Cir.1986) (applying California law), the debtor agreed, in the course of its bankruptcy proceedings, to segregate any rental income received on certain real property for the benefit of John Hancock Mutual Life Insurance Company ("Hancock"). The debtor acquired the property from a third party; therefore, the debtor purchased the property only subject to the Hancock lien. The debtor further agreed that Hancock had a lien on these rental proceeds and would not use the proceeds without a prior order of the Bankruptcy Court. The automatic stay was terminated, and a nonjudicial foreclosure sale was held. At the time of the trustee's sale, Hancock bid only the amount of $3,910,-599.35, although the indebtedness due and owing to Hancock was $4,804,721.56, which is $894,122.21 greater than the credit bid amount. Thereafter, the debtor requested that its bankruptcy case be dismissed. The debtor was then holding the sum of $42,800 as rental proceeds from the real property.

A dispute arose between the debtor and Hancock as to whether Hancock would be bound by its stipulation concerning the value of the real property in the bankruptcy proceedings. The debtor further argued that any additional recovery by Hancock; that is, the turnover of the rental proceeds held by the debtor, would be unjust enrichment and in contravention of California's anti-deficiency judgment statutes.

Pursuant to the terms of the deed of trust, the rental proceeds were additional collateral for Hancock. The debtor had further agreed that Hancock's security interest in the proceeds was perfected. The Bankruptcy Appellate Panel ("BAP") then relied on a long line of California cases which held that the deficiency judgment statutes were not applicable. The pursuit of additional security was not the pursuit of a deficiency judgment; the California anti-deficiency judgment statutes were only applicable after the security had been exhausted. *Id.* at 103.

In this case, the Debtor also acquired real property subject to certain liens. The Debtor has not contested the validity of any of the Defendants' liens on the real property. Each of the Defendants also had an assignment of rents clause in the deed of trust. The Defen-

dants filed a motion to sequester, an objection to the use of cash collateral, or a similar pleading, after these bankruptcy proceedings were filed to perfect their security interest in the cash collateral that the Debtor was receiving. *In re American Continental Corp.,* 105 B.R. 564 (Bankr.D.Ariz.1989). Therefore, as in *Madera Farms,* the Defendants in this case had a perfected security interest in the rental proceeds from the real property, and this Debtor held the rental proceeds as additional security for the repayment of the Defendants' indebtedness.

The Debtor then attempts to distinguish *Madera Farms* by stating that the applicable California anti-deficiency judgment statute is different from that in Arizona. However, in *Baker v. Gardner,* 160 Ariz. 98, 102, 770 P.2d 766, 771 (1988), the Arizona Supreme Court reviewed the California anti-deficiency judg-

ment statutes and noted they were similar to Arizona's. Secured creditors in California must indeed exhaust their security before bringing an action on the debt (i.e. an action for a deficiency judgment pursuant to *California Code Civ.Proc.* § 580a). However, the Arizona Supreme Court noted that such a procedure was required because of a different provision under the California Statutes, specifically *California Code Civ.Proc.* § 726.

In reviewing Cal.Civ.Proc. § 580a (West 1976 & Supp.1992) and Ariz.Rev.Stat.Ann. § 33–814 (West 1974 & Supp.1992) [11], this Court is not persuaded that the California and Arizona statutes are so dissimilar that a different result from that in *Madera Farms* is dictated. Subsection G of A.R.S. § 33–814 does use the words "no action may be maintained to recover any difference between the

11. California Code Civ.Proc. § 580a (West 1976 & Supp.1992) provides in relevant part:

Whenever a money judgment is sought for the balance due upon an obligation for the payment of which a deed of trust or mortgage with power of sale upon real property or any interest therein was given as security, following the exercise of the power of sale in such deed of trust or mortgage, the plaintiff shall set forth in his complaint the entire amount of the indebtedness which was secured by said deed of trust or mortgage at the time of sale, the amount for which such real property or interest therein was sold and the fair market value thereof at the date of sale and the date of that sale.... Before rendering any judgment the court shall find the fair market value of the real property, or interest therein sold, at the time of sale. The court may render judgment for not more than the amount by which the entire amount of the indebtedness due at the time of sale exceeded the fair market value of the real property or interest therein sold at the time of sale with interest thereon from the date of the sale; provided, however, that in no event shall the amount of the judgment, exclusive of interest after the date of sale, exceed the difference between the amount for which the property was sold and the entire amount of the indebtedness secured by the deed of trust or mortgage....

In turn, the relevant provisions of Arizona law are:

Ariz.Rev.Stat.Ann. § 33–814(A) (West 1974 & Supp.1992).

Except as provided in subsections F and G of this section, within ninety days after the date of sale of trust property under a trust deed pursuant to § 33–807, an action may be maintained to recover a deficiency judgment against any person directly, indirectly or contingently lia-

ble on the contract for which the trust deed was given as security including any guarantor of or surety for the contract and any partner of a trustor or other obligor which is a partnership. In any such action against such a person, the deficiency judgment shall be for an amount equal to the sum of the total amount owed the beneficiary as of the date of the sale, as determined by the court and the amount owed on all prior liens and encumbrances with interest, less the fair market value of the trust property on the date of the sale as determined by the court or the sale price at the trustee's sale, whichever is higher. Any deficiency judgment recovered shall include interest on the amount of the deficiency from the date of the sale at the rate provided in the deed of trust or in any of the contracts evidencing the debt, together with any costs and disbursements of the action.

\* \* \* \* \* \*

Ariz.Rev.Stat.Ann. § 33–814(D) (West 1974 & Supp.1992).

If no action is maintained for a deficiency judgment within the time period prescribed in subsections A and B of this section, the proceeds of the sale, regardless of amount, shall be deemed to be in full satisfaction of the obligation and no right to recover a deficiency in any action shall exist.

Ariz.Rev.Stat.Ann. § 33–814(G) (West 1974 & Supp.1992).

If the trust property of two and one-half acres or less which is limited to and utilized for either a single one-family or a single two-family dwelling is sold pursuant to the trustee's power of sale, no action may be maintained to recover any difference between the amount obtained by sale and the amount of the indebtedness and any interest, costs and expenses.

amount obtained by sale and the amount of the indebtedness and any interest, costs and expenses". However, the action referred to in the Section generally is one for a deficiency judgment. The creditors do not seek to enforce any type of unsecured claim against the Debtor, rather they seek a turnover of the collateral that has been held by the Debtor for a substantial period of time pursuant to Bankruptcy Court order.

The Debtor also argues that *Madera Farms* relies on certain California decisions which refer to statutes that actually support the Debtor's position. The decision of *Madera Farms* relies on *Hatch v. Security–First Notes Bank of Los Angeles,* 19 Cal.2d 254, 120 P.2d 869 (1942), and *Mortgage Guarantee Co. v. Sampsell,* 51 Cal.App.2d 180, 124 P.2d 353 (1942). In turn, these decisions refer to a New York statute. The Courts in *Hatch* and *Sampsell* state that under New York law, a failure to request a deficiency judgment within a certain period of time is tantamount to a concession that the secured creditor has been paid in full. The Courts then note that California law does not support such a conclusion. The Debtor next argues that the New York statutes are more analogous to those in Arizona than the statutes of California concerning the ability to recover a deficiency balance and that this Court should follow the law of New York. The difficulty with the *Hatch* and *Sampsell* decisions, and the Debtor's argument, is that they do not consider the entirety of relevant New York law.

The statutes of New York do provide that actions for a deficiency judgment shall be commenced within a certain period of time.[12] A failure to commence such a timely action for a deficiency judgment may result in the inability to recover additional security for an indebtedness.[13] However, one relevant statutory provision has not been discussed by the Debtor.

N.Y. RPAPL § 1371(4) (McKinney 1962) provides that:

Notwithstanding the foregoing provisions [i.e. § 1371(2) or (3)] and irrespective of whether a motion for a deficiency judgment shall have been made, or if made, shall have been denied, the court shall direct that all moneys remaining in the hands of a receiver of rents and profits appointed in the action ... or any moneys remaining in the hands of a mortgagee in possession or an assignee of rents and profits of the premises, shall be paid to the plaintiff to the extent of the amount, if any, by which the judgment of foreclosure and sale exceeds the amount paid for the property upon the sale.

Therefore, the New York statutes specifically provide an alternative, directing the turnover of funds held by the receiver to the secured creditor, if an indebtedness remains due and owing to the secured creditor after the property has been sold. The decision of *New England Mut. Life Ins. Co. v. Clarkford House Co.,* 36 A.D.2d 976, 321 N.Y.S.2d 624 (1971), interprets this Subdivision of Section 1371. A foreclosure action was commenced by a secured creditor, a judgment was entered, and the bid at the foreclosure sale of the real property was less than the judgment of foreclosure. The secured creditor had insured the obligation through the Federal Housing Administration ("FHA"); therefore, the secured creditor had assigned its interest in the property to the FHA. Nevertheless, the funds accumulated by the receiver during the foreclosure action, *as well as certain*

---

**12.** N.Y. RPAPL § 1371(2) (McKinney 1962) states, in relevant part:

Simultaneously with the making of a motion for an order confirming the sale, provided such motion is made within ninety days after the date of the consummation of the sale ... the party to whom such residue shall be owing may make a motion in the action for leave to enter a deficiency judgment....

N.Y. RPAPL § 1371(3) (McKinney 1962) provides that:

If no motion for a deficiency judgment shall be made as herein prescribed the proceeds of the sale regardless of the amount shall be deemed in *full satisfaction* of the mortgage *debt* and no right to recover any deficiency in *any* action or proceeding shall exist. [Emphasis added.]

**13.** *Statewide Sav. and Loan Assoc. v. Canoe Hill, Inc.,* 54 A.D.2d 1018, 388 N.Y.S.2d 188, 189 (1976), *aff'd* 44 N.Y.2d 843, 406 N.Y.S.2d 755, 378 N.E.2d 118 (1978). *See also Band Realty Co. v. North Brewster, Inc.,* 59 A.D.2d 770, 398 N.Y.S.2d 724, 725 (1977) and *Bedcro Realty Corp. v. Title Guarantee & Trust Co.,* 290 N.Y. 520, 49 N.E.2d 992 (1943).

*funds held by a financial institution as the agent of the mortgagee,* belonged to the mortgagee pursuant to Section 1371(4). The Court further stated that the trial court's reliance on Section 1371(3) concerning the requirements that a deficiency judgment be timely obtained or the secured indebtedness would be deemed paid in full was misplaced. The *Clarkford House* Court distinguished the facts before it from those cases that held Section 1371(3) applied even in those situations where a creditor was seeking to recover against additional collateral.[14] The proceeds received from the real property that was sold were not considered to be "additional collateral" requiring that the creditor proceed by way of a deficiency judgment.

In fact, shortly before the *Clarkford House* opinion, the Second Circuit independently reviewed Section 1371(4) and concluded that where the mortgagee had paid the sum of $500, and had credit bid *the total amount then due and owing* by the mortgagor to the mortgagee at the foreclosure sale, no deficiency resulted from the sale of the property. Hence, none of the proceeds received from the income-producing property and held by the bankruptcy trustee, could be recovered by the mortgagee. The Second Circuit decision supports, by way of implication, this Court's conclusion that if the secured creditor is able to show a deficiency balance after a trustee's sale of income-producing property, the bankruptcy court may exercise its equitable powers and direct the proceeds of the income-producing property to be turned over to the creditor. However, a deficiency balance must be shown to the bankruptcy court.

A review of the California, New York and Arizona statutes reveals a closer similarity between the statutes of New York and Arizona. However, California Courts, with no similar provision to Section 1371(4) under New York real property law, have still permitted a secured creditor with a lien on income-producing real property to recover the proceeds or income from the real property so long as a deficiency existed. Although there are no decisions on point in Arizona, permitting the Defendants in this adversary proceeding which are still owed a deficiency to recover in a like manner from the proceeds held by the Debtor pursuant to Bankruptcy Court order, effectuates a result that is consonant with the case law of California and the case law and statutes of New York.

AC and Home Federal have made a showing of a deficiency balance to this Court and are, therefore, entitled to a recovery from the Bankruptcy Funds. The Court assumes that the Debtor, AC and Home Federal may meet and determine the deficiency created as to each creditor after the trustee's sales and the current distribution to each creditor to be made from the Bankruptcy Funds. This information should be supplied to the Court within 28 days of the date of this Order.

c. *Whether A Secured Creditor Is Entitled To Any Of The Bankruptcy Funds As A Result Of A Potential Merger Of The Real Property Estates.*

 The Debtor argues that none of the Defendants have a claim to the Bankruptcy Funds, as a result of the merger of estates doctrine. A merger may occur after the foreclosure sale, when the mortgagee's interest and the fee interest are owned by the same person or entity. *Mid Kansas Fed. Sav. & Loan Ass'n v. Dynamic Dev.,* 167 Ariz. 122, 804 P.2d 1310 (1991), citing 3 *R. Powell, The Law of Real Property* § 459 (1990 Rev.). However, merger is not an absolute doctrine. If a "contrary intent or equitable considerations" are present, the Court may refuse to apply the doctrine. *Id.,* citing to *L. Jones, the Law of Mortgages* § 1080 (8th ed. 1928). Equitable considerations would certainly be present if the Defendants had bid in the market value of the subject real property at the time of the trustee's sales and had credited the Debtor with any additional funds received by the Defendants concerning the further sale of the real property.[15] The Debtor has presented no evidence to the Court that the Defendants

14. See N.Y. RPAPL § 1371(3), *supra,* note 12. The Court in *Clarkford House* also specifically referred to *Klein v. Gray,* 127 N.Y.S.2d 459 (N.Y.Sup.Ct.1954).

15. See also *In re Richardson,* 48 B.R. 141 (Bankr.E.D.Tenn.1985).

acted other than equitably, bidding in the market value of the property at the trustee's sales and crediting the Debtor as appropriate.[16] Therefore, the Debtor's argument must fail. The Defendants may still recover from the Bankruptcy Funds, if they did not bid in the aggregate amount of their indebtedness at the trustee's sales.

*d. Whether Oklahoma P.A.C. The Debtor Is Entitled To Retain The Bankruptcy Funds Pursuant To Bankruptcy Code Section 1111.*

■ The Debtor argues that the Defendants' claim to the Bankruptcy Funds is predicated on *in personam* liability under 11 U.S.C. § 1111 and that any right to recover on said claim terminated upon foreclosure at the trustee's sales or vacatur of the automatic stay.

· However, the Court notes that the Debtor purchased the Houses subject to the liens of the Defendants, not only on the real property but also on any income derived therefrom. The lien on the income produced by the real property is expressly recognized in Arizona. *In re American Continental Corp.,* 105 B.R. 564 (Bankr.D.Ariz.1989). The Defendants do not assert any unsecured claims against the Debtor or the principals of the Debtor. Rather, the Defendants assert that the Bankruptcy Funds constitute additional collateral to the Defendants and that a recovery therefrom is only an action *in rem.* Moreover, the cases cited by the Debtor do not stand for the broad proposition that the Debtor urges. For instance, in *Matter of DRW Property Co. 82,* 57 B.R. 987 (Bankr.N.D.Tex.1986), the undersecured creditor asserted that it was entitled to a distribution as an unsecured creditor on its deficiency claim in the debtor's Chapter 11 bankruptcy proceeding, even though the collateral had been abandoned or foreclosed upon by the creditor. In stating that it had an unsecured claim, the undersecured creditor then attempted to object to the debtor's disclosure statement. The Court noted that the objection should be overruled.

In *DRW Property,* the Court stated that the debtor did not intend to include the deficiency claims of the undersecured creditors in the class of unsecured creditors. *Id.* at 989. However, a distribution to a creditor under a Chapter 11 plan of reorganization is not analogous to a creditor seeking to recover additional collateral.

The *DRW Property* Court then cites to *15 Collier on Bankruptcy* ¶ 1111.02 at 1111–24 and states:

"Although the language of section 1111(b) does not refer specifically to abandonments, *if the property is not sold, but returned to the secured party, the nonrecourse deficiency claim should disappear.* While section 1111(b)(1)(A)(ii) converts a nonrecourse claim into a recourse claim unless the property is sold under section 363 or under the plan, the subparagraph does not mention abandonment. *This may well constitute an omission rather than an expression of the intent of Congress. The effect of abandonment is the same as the effect of a sale under Section 363 or under the plan* ". (emphasis added) Although the language of § 1111(b) does not specifically refer to dispositions of property of the estate pursuant to a motion for relief from the automatic stay or abandonment to the secured creditor, this Court holds that the Congressional intent is nevertheless clear that such dispositions are equally applicable exceptions to the general rule regarding transformation of the non-recourse creditor into a recourse creditor. In effect, a non-recourse, undersecured creditor has "waived" its right to recourse status under Section 1111(b)(1)(A) by seeking and obtaining possession of their collateral pursuant to a motion for relief from stay or motion for abandonment. [Footnote 5 omitted.]

*Id.* at 993. *Collier* does state that "the non-recourse deficiency claim should disappear", if the real property is abandoned by the bankruptcy estate or returned to the secured party. However, the *Fifty Associates,* and *Madera Farms* decisions provide authority

---

**16.** In fact, the argument of Hinton et al. is that it bid at least 30 percent *in excess* of the market value.

for the proposition that in the Ninth Circuit, a lien on real property income is extant as of the recordation of the deed of trust and that the secured creditor may recover this income to pay an indebtedness still due and owing to it although the real property has been sold, foreclosed, or abandoned. Moreover, as noted previously, the Defendants are not pursuing an *in personam* claim against the Debtor. Therefore, the Debtor's argument focusing on Section 1111 and a nonrecourse versus a recourse obligation misstates the nature of the dispute between the Debtor and the Defendants.

### II. Houses for which no foreclosure has occurred.

■ Certain Houses have been retained by the Debtor, but the loans are now current; or the Houses have been abandoned or returned to the Defendants, although the loans may be current as a result of certain payments by third parties.

The Debtor and the Defendants should ascertain to what extent any default still exists as to any of these loans. To the extent that there are any current defaults, the Debtor must utilize the Bankruptcy Funds to cure same. (See Court's prior discussion that the Bankruptcy Funds constitute additional collateral of the Defendants.) However, if there are no defaults, and it appears that the Defendants do not seriously dispute said point, the Debtor should be able to have the Bankruptcy Funds returned to it for use in the Debtor's business operations. The Debtor's bankruptcy case has been dismissed. The Court sees no purpose to be served by requiring the Debtor to retain the funds in a segregated, interest-bearing account.

Moreover, if the loans are indeed current, the continued ownership of the Houses by the Debtor is not required for the Debtor to retain the Bankruptcy Funds. The Debtor initially purchased the Houses subject to liens on the real property, as well as the income derived therefrom. The liens continue to exist on the Houses and the income that is derived from the Houses. However, as with a pending deed of trust sale, once the borrower cures the default or reinstates the loan, the income derived from the real property must be turned over to the borrower. The same analysis is applicable to this Debtor. Once the default is cured or the loan is reinstated from the payment from the Bankruptcy Funds or as a result of payments by a third party, the Debtor is once again able to utilize the rents or income from the property as the Debtor sees fit.

If the Debtor has abandoned the Houses or returned the Houses to the Defendants, the Defendants are still entitled to utilize the Bankruptcy Funds for the limited purpose of curing any defaults under said loans. (See Discussion concerning the Bankruptcy Funds as additional collateral.) However, if the loans are current as a result of certain payments from third parties, the Debtor is entitled to use the Bankruptcy Funds in its business operations.

The Debtor and the remaining Defendants shall meet and prepare an accounting based upon this Court's decision. The Court anticipates that a portion of the Bankruptcy Funds will be turned over to certain Defendants, with the Debtor to retain the balance for its business operations.

**IT IS SO ORDERED.**